**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **REGIONAL INDUSTRIAL SERVICES CORP., and ROBERT E. OPPENHEIM,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**PURE HEDGE, LLC, VALENTINA SOLOMITA, STERLING PROPERTY, LLC, and SCHNITZER STEEL INDUSTRIES, INC.**<br><br>**Defendants.** | **CIVIL ACTION**<br>**NO. 4:20-40064-TSH** |

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 34), PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Docket No. 44), and PLAINTIFFS' MOTION TO STRIKE (Docket No. 58)**

**June 13, 2022**

**HILLMAN, D.J.**

Plaintiffs Regional Industrial Services Corp. ("Regional") and Robert Oppenheim (collectively, "Plaintiffs") and defendants Pure Hedge, LLC ("Pure Hedge") and Valentina Solomita (collectively, "Defendants") planned to work together on a development property in Sterling, Connecticut. In November 2018, Regional and Pure Hedge signed a Letter of Commitment, stating that Regional would perform demolition work on the property, subject to Pure Hedge acquiring the property. After Pure Hedge acquired the property, Pure Hedge hired a third party to perform the demolition work. Regional, believing it had an enforceable contract with Pure Hedge, commenced this action, alleging breach of contract and other claims stemming from the failed business relationship. Defendants filed several counterclaims. The parties cross-

move for summary judgment on Plaintiffs' breach of contract claim (Claim One).  Defendants move for summary judgment on Plaintiffs' remaining claims against them (Claims Two, Three, Four, and Seven).[1]  Plaintiffs' move for summary judgment on Defendants' counterclaims (Counterclaims One through Four).  For the following reasons, the Court ***grants*** summary judgment for Defendants on Claims One, Two, Three, Four and Seven, ***denies*** summary judgment for Plaintiffs on Claim One, and ***grants*** summary judgment for Plaintiffs on Counterclaims One through Four.

## Background

Robert Oppenheim is the founder and owner of Regional, a demolition company based in Massachusetts.  Valentina Solomita is the founder and owner of Pure Hedge, an investment company based in New York.  In 2018, Regional and Pure Hedge each learned of a property for sale in Sterling, Connecticut (the "Property").  Regional was interested in performing demolition work on the Property; Pure Hedge was interested in acquiring the Property for redevelopment.  In September 2018, Oppenheim and Solomita were introduced to one another through a mutual connection.  Oppenheim indicated to Solomita that demolition work on the property would cost $450,000.  According to Solomita, Oppenheim also agreed to invest in the project.

On November 23, 2018, Solomita sent Oppenheim a Letter of Commitment ("LOC"), which stated, "With regards to our prior discussions regarding the Property, this letter will confirm our understating that . . . Your firm will provide all, of the services, equipment and resources associated with dismantling the Property as described in your contract for a fixed fee of . . .

---

[1] Plaintiffs also brought claims against Schnitzer Steel Industries, Inc (Claims Five and Six).  Those claims are addressed in a separate order and memorandum.  (Docket No. 65).  Plaintiffs further name Sterling Property, LLC as a defendant, but they assert no causes of action against it.

$450,000.00." The LOC further stated that RIS would receive a "Success Fee" of $250,000.00 for "assisting in and obtaining a Letter of Intent from a third party for the purchase or rental of the Property post clean up." The amounts in the LOC were contingent upon Pure Hedge acquiring the Property. Oppenheim and Solomita each signed the LOC on behalf of their respective companies.

At his deposition, Oppenheim testified that he expected the details surrounding the demolition to come in a later contract or proposal. Indeed, the LOC explicitly references another "contract." At her deposition, Solomita testified that the LOC was meant to confirm her and Oppenheim's understanding of their prior conversations.

On November 28, 2018, Regional forwarded a letter to Solomita through a mutual connection. In the letter, a person named Mark Troiano expressed interest in building and operating a waste recycling station at the Property. The letter did not identify whether Troiano would purchase or lease the Property, the purchase price or lease terms of the Property, the timing of the purchase or lease, or any specifics about a potential transaction. Aside from placing an unanswered call to Oppenheim, Solomita did not follow up on the letter.

On December 27, 2018, Solomita formed Sterling Property, LLC, which would later acquire the Property. There are two versions of Sterling's formation documents in the record. In one version, Oppenheim is listed as an initial member; in the other, he is not. Solomita testified that she listed Oppenheim as an initial member of Sterling because Oppenheim wanted to participate in Sterling as an investor. She also testified that he was listed erroneously, and that she had the listing corrected as soon as she noticed it. Oppenheim testified that he never agreed to participate in Sterling as an investor; his understanding was that Solomita was making him a member of Sterling as an assurance that he would be given a "finder's fee" for bringing the parties

to the Property together (i.e., for facilitating the sale of the Property from the original owner to Solomita).

In January 2019, Regional paid $5,000 to Pure Hedge's attorney, who was conducting due diligence on the Property. Oppenheim represents that Regional paid Pure Hedge's attorney to assist Solomita in acquiring the Property. Solomita represents that Regional paid Pure Hedge's attorney to gather information regarding the status of the Property.

On February 11, 2019, Solomita sent a letter to Oppenheim expressing frustration at Oppenheim's lack of communication regarding the Property. The letter stated that Oppenheim had "agreed to invest $400,000" into Sterling, and that Pure Hedge would deem its "offer" to Oppenheim to participate in the project as an investor "revoked" if Oppenheim did not make the $400,000 investment within two days. The letter indicated that Oppenheim's decision, whatever it was, would be "fine and respected." Oppenheim never sent Solomita, Pure Hedge, or Sterling a $400,000 investment. The letter continued,

> We can still employ your company's services with the dismantling of the property and accept written leasing commitments from your accredited relationships. However, we need a formal signed detailed quote in writing which is specific to the scope of work for the entire project (including all outsourced subcontractors for equipment fluids, fly ash removal etc. in compliance with DEEP which is included in the dismantling), which we have requested multiple times, and then must move forward with a formal contract.

On February 13, 2019, Regional sent Pure Hedge a demolition work plan for the Property. Solomita viewed the plan as deficient and requested certain changes. On March 4, 2019, Regional sent Solomita a revised plan, as well as a document titled, "Proposal." The proposal outlined the scope of work, noted certain exclusions, and quoted the price of the work at $450,000. The proposal also stated, "Payments will be made as per Letter of Intent that is dated 11-23-2018."

Solomita did not respond to the revised plan or proposal. On March 18, 2019, Regional renewed its Class A Demolition Contractor's License with the State of Connecticut. On March

26, 2019, Regional applied for and received a permit from the Town of Sterling for selective demolition and dismantling on the Property. Oppenheim testified that he applied for the permit at Solomita's request; Solomita testified that she never asked Oppenheim to do so.

On May 13, 2019, Regional contacted Solomita to inquire about the status of the project. Regional indicated that it had a demolition permit in place, and that it was ready to proceed on Solomita's notice. Solomita did not respond.

On July 16, 2019, Sterling officially acquired the Property. On October 29, 2019, Sterling hired Atlantic Coast Dismantling, LLC ("Atlantic") for demolition work on the Property. Pure Hedge paid Atlantic over $800,000 for the work.

After learning that Pure Hedge had hired another contractor to perform the demolition work on the Property, Plaintiffs commenced this action. Plaintiffs allege breach of contract against Pure Hedge (Claim One), breach of the covenant of good faith and fair dealing against Pure Hedge (Claim Two), promissory estoppel against Pure Hedge (Claim Three), violations of the Massachusetts Consumer Protection Act, M. G. L. c. 93A, against Pure Hedge and Solomita (Claim Four), and breach of fiduciary duty against Solomita (Claim Seven). In response, Defendants filed several counterclaims against Plaintiffs, alleging intentional misrepresentation (Counterclaim One), negligent misrepresentation (Counterclaim Two), promissory estoppel (Counterclaim Three), and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Counterclaim Four). The parties cross-move for summary judgment on Plaintiffs' breach of contract claim (Claim One). Defendants move for summary judgment on Plaintiffs' remaining claims against them (Claims Two, Three, Four, and Seven). Plaintiffs move for summary judgment on Defendants' counterclaims (Counterclaims One through Four).

Plaintiffs also move to strike a declaration submitted in opposition to their motion for summary judgment.

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute of material fact arises "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (quoting *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009)).  The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  In assessing a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996).

## Discussion

*1. Breach of Contract (Claim One)*

Plaintiffs allege that Regional and Pure Hedge "entered into a written contract for the performance of demolition work at the [Property] on November 23, 2018," and that Pure Hedge breached the contract by engaging a third party to perform the agreed-upon demolition work and failing to pay Regional a success fee for procuring a letter of intent for the purchase or rental of the Property.

Regarding choice of law, the parties agree that Connecticut law applies. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) ("Courts do not worry about conflict of laws unless

the parties disagree on which state's law applies."). Plaintiffs assert that the LOC is an enforceable contract. Pure Hedge contends otherwise.

For an agreement to be enforceable, its "terms and requirements" must be "definite and certain." *Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 942 (Conn. 2005). Where an agreement appears to be "no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms," it is unenforceable. *Shuffield Development Associates Ltd. Partnership v. Society for Sav.*, 708 A.2d 1361, 1366 (Conn. 1998) (quoting *Westbrook v. Times-Star Co.*, 191 A. 91, 94 (Conn. 1937). In determining whether an agreement is enforceable "or merely an intention to negotiate a contract in the future," courts consider the language of the agreement, the circumstances surrounding the agreement, and the purpose of the agreement. *See Fowler v. Weiss*, 546 A.2d 321, 323 (Conn. App. Ct. 1988). Whether an agreement contains all its essential terms turns "on the particular circumstances of each case." *Squillante v. Capital Region Dev. Auth.*, 266 A.3d 940, 950 (Conn. App. Ct. 2021) (quoting *Willow Funding Co., L.P. v. Grencom Assocs.*, 799 A.2d 174, 182 (Conn. 2011)).

The LOC states, as to demolition work, "Your firm will provide all, of the services, equipment and resources associated with dismantling the Property as described in your contract for a fixed fee of . . . $450,000.00." The LOC does not define the "services, equipment and resources" Regional will provide; it leaves the definition of those terms open to another "contract." Indeed, the LOC's purpose appears to be to "confirm" the parties' "understanding" of their "prior discussions," not to set forth the details of the proposed demolition work. Because the details of

the demolition matter,[2] the LOC, by its language and purpose, appears to be an incomplete agreement.

The circumstances surrounding the LOC confirm that it is an incomplete agreement. First, Oppenheim testified that he expected the details of the demolition to be provided in a later contract or proposal. Second, months after signing the LOC, Solomita sent Oppenheim a letter stating that she needed "a formal signed detailed quote in writing which is specific to the scope of work for the entire project . . . and then [we] must move forward with a formal contract." Third, Regional responded to Solomita's letter with a detailed work plan; when Solomita provided feedback on the plan, Regional updated it and created a proposal. The proposal outlined the scope of work, noted various exclusions, and quoted the project's price. The proposal also referred to the LOC as a "Letter of Intent." From these facts, even when viewed in the light most favorable to Plaintiffs, no reasonable jury could conclude that the LOC was a complete agreement. Accordingly, the LOC is unenforceable.

Plaintiffs' arguments to the contrary are unavailing. First, while the LOC evinces an offer and acceptance, for an offer and acceptance to constitute an enforceable contract, "each must be found to have been based on an identical understanding of the parties," and no "essential matters" must be "left open for further consideration." *Saint Bernard School of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1074 (Conn. 2014) (citations and quotations omitted). As explained, the LOC is incomplete. Second, the LOC is materially different than the Atlantic contract, which, unlike the LOC, includes an attached document outlining a scope of work.

---

[2] For instance, the parties disagree over whether Regional's $450,000 quote in the LOC included environmental remediation on the Property. Solomita testified that she believed that it did; Oppenheim testified that it did not.

Third, *Jaybe Const. Co. v. Beco, Inc.*, 216 A.2d 208 (Conn. 1965), is inapposite. There, the defendant subcontractor sent a letter to the plaintiff general contractor indicating that the defendant could perform certain, specific work on a project for which the plaintiff was bidding. *Jaybe*, 216 A.2d at 209-10. The plaintiff, without telling the defendant, incorporated the defendant's offer into a bid for the project. *Id.* at 210. When the plaintiff won the contract, the defendant tried to charge the plaintiff more for the quoted work. *Id.* The court held, "When the plaintiff used the defendant's figure in computing its own bid, it bound itself to perform in reliance on the defendant's terms." *Id.* at 211. Here, none of Plaintiffs actions reasonably can be said to have bound Pure Hedge into hiring Regional for demolition work on the Property, especially because, unlike in *Jaybe*, the scope of work in the LOC was undefined.

As to the success fee, even if the LOC were considered a complete agreement, no reasonable jury could find that the Troiano letter entitled Regional to such a fee. The LOC purports to award a success fee for procuring a letter of intent from a third party to purchase or rent the Property post clean-up. The Troiano letter makes no reference to purchasing or renting the Property. Even viewing the facts in Plaintiffs' favor, no reasonable jury could find for Plaintiffs. Thus, summary judgment on Plaintiffs' breach of contract claim is <u>granted</u> for Pure Hedge and <u>denied</u> for Plaintiffs.

### 2. Plaintiffs' Remaining Claims

#### a. Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim Two)

Plaintiffs allege that Pure Hedge breached the covenant of good faith and fair dealing implied in the contract between Regional and Pure Hedge. Because there was no enforceable contract between Regional and Pure Hedge, Pure Hedge did not violate the covenant of good faith and fair dealing. *See Blumberg Assocs. Worldwide v. Brown & Brown of Conn., Inc.*, 84 A.3d

9

840, 876-77 (Conn. 2014). Thus, summary judgment on Plaintiffs' breach of implied covenant claim for Pure Hedge is granted.

### b. *Promissory Estoppel (Claim Three)*

Plaintiffs allege that Pure Hedge's promise to pay Regional to perform demolition work on the Property should be enforced under a theory of promissory estoppel. To recover under a theory of promissory estoppel, a plaintiff must prove that "(1) the promisor made a clear and definite promise; (2) the promisee reasonably relied on the promise; (3) the promise induced the action taken by the promisee; and (4) injustice can be avoided only by enforcement of the promise." *Adair v. Pfizer, Inc.*, 245 F. Supp. 2d 437, 444 (D. Conn. 2003).

Pure Hedge's promise to hire Regional to perform demolition work on the Property lacked clarity and definiteness. As explained, Pure Hedge agreed to hire Regional for "services, equipment and resources associated with dismantling the Property as described in your contract" (emphasis added). By referencing another contract, the promise reflected an intent to contract in the future, not a present intent to commit. *See Stewart v. Cendant Mobility Services Corp.*, 837 A.2d 736, 742 (Conn. 2003). Indeed, Oppenheim testified that he excepted the project's scope of work to come in a later contract or proposal. Moreover, Pure Hedge's statements and conduct suggest that it was not committed to hiring Regional absent an additional agreement.[3] The lack of clarity and definiteness of Pure Hedge's representation is fatal to Plaintiffs' promissory estoppel theory. *See D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High School*, 520 A.2d 217, 221-

---

[3] Plaintiffs argue that Pure Hedge and Solomita reassured Regional that Regional would perform the work for months following the LOC. But the record suggests otherwise. In February 2019, for instance, Pure Hedge told Regional, "We can still employ your company's services . . . However, we needed a formal signed detailed quote in writing . . . and then must move forward with a formal contract." Thereafter, Regional sent Pure Hedge a proposal, but Pure Hedge never agreed to the proposal. There is also no evidence in the record of the two entities having moved forward with a "formal contract."

22 (Conn. 1987); *see also T&M Building Co., Inc. v. Hastings*, 221 A.3d 857, 872-74 (Conn. App. Ct. 2019). No reasonable jury could find that the Pure Hedge's representation constituted a promise definite enough to induce reliance on the part of Regional. Accordingly, summary judgment for Pure Hedge on Plaintiffs' promissory estoppel claim is granted.

### c. M. G. L. c. 93A (Claim Four)

Plaintiffs allege that Pure Hedge and Solomita engaged in unfair or deceptive conduct in violation of M. G. L. c. 93A. Pure Hedge argues that it did not engage in any conduct "primarily and substantially" in Massachusetts, as is required for liability under M. G. L. c. 93A. *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 798 (Mass. 2003). Plaintiffs do not contend otherwise, arguing instead that the Court can construe the complaint to assert a claim under Connecticut's Unfair Trade Practices Act. The Court rejects this argument. *See Calvi v. Knox County*, 470 F.3d 422, 431 (1st Cir. 2006) (parties may not raise new theories of liability for the first time in opposition to a motion for summary judgment). Thus, summary judgment for Pure Hedge and Solomita on Plaintiffs' M. G. L. c. 93A claim is granted.

### d. Breach of Fiduciary Duty (Claim Seven)

Plaintiffs allege that Solomita, as the managing member of Sterling Property, LLC ("Sterling"), breached fiduciary duties she owed to Oppenheim, a member of Sterling. Solomita argues that Oppenheim was never a member of Sterling. Of the two sets of formation documents in the record, however, one lists Oppenheim as an initial member. Solomita testified that she named Oppenheim as an initial member because he had agreed to invest in Sterling. Oppenheim testified that he believed he was named a member of Sterling as an assurance that he would be paid a finder's fee for the Property. From these facts, a jury reasonably could find that Oppenheim, for at least some period, was a member of Sterling.

Solomita also argues that, while acting as the managing member of Sterling, she did nothing wrong. Managing members of Delaware LLCs owe default fiduciary duties of care and loyalty. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 659-60 (Del Ch. 2012). Plaintiffs assert that Oppenheim was entitled to a finder's fee for introducing Solomita to the Property. Apparently, Solomita did not pay Oppenheim a finder's fee. Plaintiffs offer no explanation, however, for how the failure to pay a finder's fee -- assuming one was owed – violated a fiduciary duty. *See Nikijuluw v. Gonzales*, 427 F.3d 115, 120 n.3 (1st Cir. 2005) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived"). Accordingly, summary judgment for Solomita on Plaintiffs' breach of fiduciary duty claim is granted.

### 3. Defendants' counterclaims

#### a. Intentional and Negligent Misrepresentation (Counterclaims One and Two)

Defendants allege that Plaintiffs intentionally and negligently misrepresented (1) their ability to make a $400,000 investment towards the acquisition of the Property, (2) their ability to obtain permitting and bonding to perform demolition work on the Property, (3) the cost of demolition work on the Property, and (4) the significance of the Troiano letter.

To prevail on a claim of intentional misrepresentation, Defendants must prove that Plaintiffs knowingly made a false statement of fact to induce Defendants to act, and that Defendants acted on the false statement to their detriment. *See Weisman v. Kaspar*, 661 A.2d 530, 533 (Conn. 1995). To prevail on a claim of negligent misrepresentation, Defendants must prove that Plaintiffs made a misrepresentation of fact, which Plaintiffs knew or should have known was

false, and that Defendants reasonably relied on the misrepresentation to their detriment. *See Stuart v. Freiberg*, 116 A.3d 1195, 1204 (Conn. 2015).

As to the purported $400,000 investment, viewing the evidence in Defendants' favor, Oppenheim told Solomita, sometime before November 2018, that he would make an investment towards the acquisition of the Property.[4] After doing so, however, in December 2018, Oppenheim told Solomita that he had a rare form of cancer and was not sure whether he had more than four months to live. Oppenheim also stopped answering Solomita's calls. At the end of December 2018, when Solomita formed Sterling, she removed Oppenheim as a member because "[i]t's inappropriate for me to have a member, who doesn't return phone calls and is dying, on an LLC." In February 2019, Solomita sent Oppenheim a letter which acknowledged that he had agreed to invest $400,000 in Sterling but stated that she would consider her "offer" for him to invest "revoked" if he did not wire the investment within two days. She added, "Whatever decision you make is fine and respected." From these facts, no reasonable jury could conclude that Defendants acted or relied on Oppenheim's representation to invest $400,000.

In a declaration attached to Defendants' opposition to Plaintiffs' motion for summary judgment, Solomita discloses for the first time and without documentary support, that Plaintiffs' alleged misrepresentations caused her to miss an opportunity to secure low-interest financing, led her to pay additional interest on a line of credit, and forced her to offer investors a greater return on investment.

---

[4] The Court is not convinced that the Connecticut Statute of Frauds applies. Under the Statute of Frauds, "any agreement for the sale of real property or any interest in or concerning real property" must be made in writing and signed by the party to be charged. *See* Conn. Gen. Stat. § 52-550. The record, when viewed in Defendants' favor, suggests that Oppenheim agreed to invest in Sterling (an LLC). While Sterling was created for the purpose of acquiring real property, Oppenheim's alleged representation or promise to invest in Sterling was not itself a representation or promise to acquire an interest in real property.

During discovery, Plaintiffs asked Solomita to produce all documents and records supporting her damages allegations. Solomita did not produce any. At her deposition, Plaintiffs asked Solomita whether she had obtained a mortgage from a bank to acquire the Property. Solomita responded that she "created [her] own financing," which was "private, confidential information." Plaintiffs also asked Solomita whether she had funded her project through outside investment or debt. Again, Solomita declined to answer, stating that the information was "proprietary" and "confidential." When asked whether she had any documentation to support her claim for damages of lost time, lost opportunity, and wasted effort, Solomita directed Plaintiffs to her attorney.

The Solomita declaration is "an inappropriate attempt to manufacture issues of fact and should be stricken." *Escribano-Reyes v. Professional Hepa Certificate Corp.*, 817 F.3d 380, 387 (1st Cir. 2016). Plaintiffs clearly asked Solomita for documents related to her damages, as well as for information related to her funding for the project; she did not produce any and declined to elaborate on her position at her deposition. Her lack of disclosure during discovery is sufficiently contradictory to her present position that striking the declaration is warranted. Accordingly, Plaintiffs' motion to strike the declaration is granted.

As to Plaintiffs' ability to obtain permitting and bonding for the demolition, Regional did in fact obtain permitting for the demolition, and there is no indication in the record that it could not have obtained bonding. Thus, no reasonable jury, on this record, could find that such a representation was false. The same holds for Plaintiffs' representation about the cost of demolition. The fact that Atlantic charged Pure Hedge $800,000 does not, without more, indicate

that Regional would not have been able to do the work for $450,000.[5]  Finally, the Troiano letter was not written by Plaintiffs, and it is undisputed that Solomita did not act on the letter aside from placing one unanswered call to Oppenheim.  Accordingly, summary judgment for Plaintiffs on Defendants' intentional and negligent misrepresentations claims is <u>granted</u>.

### b.  Promissory Estoppel (Counterclaim Three)

Defendants make no specific argument against summary judgment on their promissory estoppel claim.  *See Nikijuluw*, 427 F.3d at 120 n.3.  Accordingly, summary judgment for Plaintiffs of Defendants' promissory estoppel claim is <u>granted</u>.

### c.  CUTPA (Counterclaim Four)

Defendants allege that Plaintiffs engaged in unfair conduct through the purported misrepresentations outlined above.  Although CUTPA "reaches conduct well beyond that proscribed by any common law analogue," *Associated Inv. Co. Ltd. Partnership v. Williams Assocs. IV*, 645 A.2d 505, 510 (Conn. 1994), the only alleged statement that reasonably could be considered a misrepresentation from Plaintiffs was Oppenheim's initial, verbal representation that he would invest $400,000 into the acquisition of the Property.  No reasonable jury could find that Oppenheim, by ultimately deciding not to invest, however, was acting unfairly.  Indeed, Solomita told Oppenheim that his decision on the investment, regardless of what it was, would be "fine and respected."  Thus, summary judgment for Plaintiffs on Defendants' CUTPA claim is <u>granted</u>.

## **Conclusion**

Defendants are entitled to summary judgment on Claims One, Two, Three, Four, and Seven.  Accordingly, Defendants' motion for summary judgment (Docket No. 34) is ***granted***.

---

[5] Defendants' contention that Plaintiffs' work plan and proposal was deficient according to the State of Connecticut rests on inadmissible hearsay.

Plaintiffs are not entitled to summary judgment on Claim One.  However, Plaintiffs are entitled to summary judgment on Counterclaims One through Four.  Thus, Plaintiffs' motion for summary judgment (Docket No. 44) is ***denied in part*** and ***granted in part***.  Plaintiffs' motion to strike (Docket No. 58) is ***granted***.

**SO ORDERED**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**
